Oral Deposition - Douglas Kaye
September 21, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DOUGLAS KAYE )
)
vs. ) Civil Action 4:05-CV-02809
)
)
SYNTHES (U.S.A.) )

ORAL DEPOSITION

DOUGLAS KAYE

September 21, 2006

ORAL DEPOSITION OF DOUGLAS KAYE, produced as a witness at the instance of the Defendant and duly sworn, was taken in the above-styled and numbered cause on the 21st day of September, 2006, from 1:17 p..m. to 4:02 p.m., before Karen K. Harris, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at The Mallia Law Firm, One Riverway, Suite 610, Houston, Texas 77056, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

NMA
Compressed
Transcript

EXHIBIT B

Karen K. Harris, CSR, RPR, B.A., M.A.
Nell McCallum & Assoc.   (713) 861-0203

Oral Deposition - Douglas Kaye
September 21, 2006

## Page 2

APPEARANCES

FOR PLAINTIFF:

   Mr. Andrew Rubenstein
   The Mallia Law Firm
   One Riverway, Suite 610
   Houston, Texas 77056

FOR DEFENDANT:

   Ms. Deanna H. Livingston
   Livingston & Livingston, L.L.C.
   1770 St. James Place, Suite 100
   Houston, Texas 77056

## Page 3

INDEX
                          PAGE
Examination by Ms. Livingston .................. 4
Signature Page ............................... 105
Court Reporter's Certificate .................. 106

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Deposition Notice for Douglas Kaye | 94 |
| 2 | Douglas Kaye Sugar Land Hospital Consent Forms | 94 |

## Page 4

    THE COURT REPORTER: Please put your stipulations on the record.
    MS. LIVINGSTON: According to the Rules.
    MR. RUBENSTEIN: Whatever those might be in Federal Court. Can we agree to do it, just what the state rules are for depos?
    MS. LIVINGSTON: I'll agree to that. My concern is that, given the court we're in --
    MR. RUBENSTEIN: A judge will follow the rules, and will require us to follow them. I want to make sure that what we do is not try to go around the Judge's orders.
    MS. LIVINGSTON: Very well said. Right. I agree wholeheartedly.
    THE COURT REPORTER: What about signature, please?
    MR. RUBENSTEIN: We'll read and sign.
    DOUGLAS KAYE,
having been first duly sworn, testified as follows:
    EXAMINATION
  Q.  (BY MS. LIVINGSTON) Tell us your full name, please.
  A.  Douglas Alan Kaye.
  Q.  Have you ever gone by any other names?

## Page 5

  A.  Actually, yes.
  Q.  What are those, please?
  A.  Alan.
    THE COURT REPORTER: Excuse me. Please spell Alan.
    THE WITNESS: A-L-A-N.
  Q.  (BY MS. LIVINGSTON): When was the last time you went by Alan?
  A.  When I was in school, taking French. They did not have "Douglas" in French, so I was Alain.
  Q.  So, would it be fair for me to conclude that all of the records pertinent to your health care for the past five or ten years would be under the name of Douglas Kaye?
  A.  Yes.
  Q.  Do you have any licensures or certifications?
  A.  I have my pilot's license.
  Q.  That's a private pilot?
  A.  Private.
  Q.  Are you instrument rated?
  A.  No.
  Q.  Just VFR?
  A.  Uh-huh.
  Q.  Where do you fly out of?

Karen K. Harris, CSR, RPR, B.A., M.A.
Nell McCallum & Assoc.    (713) 861-0203

Oral Deposition - Douglas Kaye
September 21, 2006

Page 6

1   A.  Houston Southwest.
2   Q.  Do you own your own plane?
3   A.  No.
4   Q.  Partial ownership?
5   A.  No.
6   Q.  What kind of plane do you enjoy flying?
7   A.  Piper.
8   Q.  A cub?
9   A.  No. Aero.
10  Q.  A long time ago, in another lifetime, I
11  used to fly Beech Musketeers.
12  A.  I have been in one.
13  Q.  Is the Aero a 6-seater plane?
14  A.  Four.
15  Q.  Four. Single prop?
16  A.  Single.
17  Q.  When did you first get your pilot's
18  license?
19  A.  Lessons in '97. License in '97.
20  Q.  And do you -- in connection with initially
21  getting your pilot's license and subsequent renewals
22  of that, do you take your flight physical?
23  A.  Yes.
24  Q.  And who is the physician that has
25  performed -- or which physician performed the initial

Page 7

1   flight physical?
2   A.  That I don't remember. Oh -- I don't
3   remember.
4   Q.  Would that physical have been in 1997?
5   A.  I believe so.
6   Q.  When was the last time that you went
7   through a physical for renewal of your pilot's
8   license?
9   A.  I'll tell you in a second. September 27th,
10  2005.
11  Q.  Which doctor performed that physical?
12  A.  Max C. Butler.
13  Q.  To the best of your knowledge, how many
14  times in the period between 1997, when you were first
15  certified as physically fit for flying, and September
16  27th, 2005, when you had your last, or most recent
17  physical, did you have physicals? So, in other
18  words, I'm trying to figure out how many times in
19  that interim, between '97 and 2005.
20  A.  '97, I had one. '99, I had one. 2001, I
21  had one. 2003, I had one. It's every two years.
22  You should remember that.
23  Q.  In 2001, who was the physician that
24  performed that physical?
25  A.  I don't recall.

Page 8

1   Q.  When was the first time that you saw
2   Dr. Butler for your flight physicals?
3   A.  2003.
4   Q.  Do you recall anything about the clinic
5   that you went to, or where it was located for your
6   '97, '99 and 2001 physicals?
7   A.  It was in Houston. I just don't remember.
8   Q.  Do you believe they were at the same place?
9   A.  No.
10  Q.  Do you believe they were three different
11  places?
12  A.  I just don't remember.
13  Q.  Do you keep any diaries or other kind of
14  calendars generally?
15  A.  Not really.
16  Q.  Is there something that you keep, that
17  would jog your memory on those kinds of things, such
18  as dates?
19  A.  Not really. My logbook is the only thing I
20  usually keep. And that doesn't have any of the
21  information you're looking for.
22  Q.  Do you have any family in Vermont?
23  A.  No.
24  Q.  Was -- when was the first time that you
25  went to Vermont?

Page 9

1   A.  In my life?
2   Q.  Yes.
3   A.  I'm going to say 1966 or '65. Something
4   like that.
5   Q.  Since then, approximately how many times
6   have you gone up there?
7   A.  200.
8   Q.  What, generally, takes you up there?
9   A.  Used to be skiing.
10  Q.  Would you describe yourself as an avid
11  skier when you were skiing?
12  A.  Yes.
13  Q.  What other avocations do you have, besides
14  flying and skiing?
15  A.  Just work.
16  Q.  Tell me about your work.
17  A.  I'm a mobile businessman. I go to my
18  clients. So I'm on the road. And I actually service
19  and sell Japanese hair cutting scissors.
20  Q.  By "service," what does that entail? What
21  do you mean by saying you service Japanese hair
22  cutting scissors?
23  A.  They go dull, and I make them sharp.
24  Q.  You are physically sharpening the blades of
25  the scissors?

3 (Pages 6 to 9)

Karen K. Harris, CSR, RPR, B.A., M.A.
Nell McCallum & Assoc.   (713) 861-0203

Page 10

1   A.  Yeah.
2   Q.  Is that correct?
3   A.  Uh-huh.
4   Q.  And do you have equipment that allows you
5   to do that, to sharpen the blades?
6   A.  Yeah.
7   Q.  Describe that for me, please.
8   A.  It's a self-contained, water-cooled factory
9   sharpening machine.
10  Q.  Who's the manufacture of it?
11  A.  My brother.
12  Q.  Who is your brother?
13  A.  Roger Kaye.
14  Q.  Where does he live?
15  A.  Glens Falls, New York.
16  Q.  Is that G-L-E-N-S?
17  A.  Uh-huh.
18  Q.  Falls is a separate word?
19  A.  Uh-huh.
20  Q.  Has he made many of those self-contained,
21  water-cooled sharpeners?
22  A.  Yes.
23  Q.  Does he sell them under a particular brand
24  name?
25  A.  Rapid Edge Technologies.

Page 11

1   Q.  To the best of your knowledge, is he the
2   owner of Rapid Edge Technologies?
3   A.  Yeah. Uh-huh.
4   Q.  Do you have any ownership interest in it?
5   A.  No.
6   Q.  Do you have an entity under which you
7   perform your work?
8   A.  I don't understand.
9   Q.  Have you incorporated?
10  A.  Oh, yes, I'm incorporated.
11  Q.  What's the name of your corporation?
12  A.  Doug Kaye, Incorporated.
13  Q.  Is that incorporation filed through the
14  secretary of state of Texas?
15  A.  Yes.
16  Q.  Do you know the date of the incorporation?
17  A.  I do not. I can get that for you if I have
18  to.
19  Q.  Just give me an approximation now, if you
20  can. Year.
21  A.  I'm going to say three years ago.
22  Q.  Fair enough. If you don't understand any
23  of my questions -- you've been doing great so far --
24  please let me know. If I'm looking for an
25  approximation or an estimate, I will let you know

Page 12

1   that, as well.
2   A.  Okay.
3   Q.  If you can't provide even an estimate, just
4   tell me.
5   A.  Uh-huh.
6   Q.  And if you can't provide a more specific --
7   if I haven't said: Give me an approximation, but yet
8   you want to answer in the form of an approximation,
9   if you can let me know that when you provide your
10  answer.
11  A.  Okay.
12  Q.  That will assist both of us in having a
13  clear record of what the questions and the answers
14  are.
15          Again, I encourage you to let me know
16  if you don't understand or hear any of my questions.
17          Those are an admonition I have, as I
18  tend to speak, perhaps, a little slowly, having been
19  born and raised in Texas.
20          So, you may know exactly where I'm
21  going a long time before I get there. But we'll end
22  up with a clearer record and make Ms. Harris a fair
23  bit happier if you'd let me finish the question
24  before you provide your answer.
25          I promise I'll do my best to allow you

Page 13

1   to give a full and complete answer before I ask my
2   next question. Fair enough?
3   A.  Yeah.
4   Q.  Did those sound like good ground rules to
5   go forward?
6   A.  Yeah.
7   Q.  Have you given a deposition before?
8   A.  No.
9   Q.  Have you been a party to any lawsuits
10  before this one?
11  A.  No.
12  Q.  Why did you decide to file this lawsuit?
13  A.  Because I felt that I would be -- that I
14  had risked my life by having to go through this
15  surgery.
16  Q.  Are you finished?
17  A.  Yes.
18  Q.  How many surgeries have you had on your
19  clavicle?
20  A.  That would be four.
21  Q.  When was the first one, approximately?
22  A.  I'm going to say I think it was in May of
23  2003. It may have been April, but I believe it was
24  May.
25  Q.  When was the skiing accident?

4 (Pages 10 to 13)

Karen K. Harris, CSR, RPR, B.A., M.A.
Nell McCallum & Assoc.   (713) 861-0203

Oral Deposition - Douglas Kaye
September 21, 2006

Page 14

1  A.  March 9th, 2003. I saved my lift ticket.
2  Q.  What mountain were you skiing?
3  A.  Mad River Glen.
4  Q.  Had you skied that before?
5  A.  Yes.
6  Q.  What was the category of run that you were
7  on?
8  A.  It was a blue run, believe it or not.
9  Q.  Were conditions particularly icy?
10 A.  No.
11 Q.  What caused the accident?
12 A.  Operator error.
13 Q.  Meaning?
14 A.  I made a mistake.
15 Q.  What kind of mistake did you make,
16 Mr. Kaye?
17 A.  I wanted to go -- I wanted to go right, and
18 I went left.
19 Q.  Were you skiing in close proximity to a
20 friend or someone else that was in your party?
21 A.  Not close. He was behind me. But, yes, I
22 was with a friend.
23 Q.  You wanted to go right, and you went left.
24 Am I getting the directions right?
25 A.  I had it in my head to make that right-hand

Page 15

1  turn. As I started to make the right-hand turn, my
2  skis went left. That was when I hit the tree. It
3  was just that easy.
4  Q.  How big was the tree?
5  A.  (Gesturing.)
6  Q.  Can you give me a verbal description of
7  that?
8  A.  I'm going to say 7 inches in diameter.
9  Q.  Do you have a recall of that collision?
10 A.  No.
11 Q.  What's the first thing following the skiing
12 into the tree that you remember?
13 A.  I'm out of work.
14 Q.  Help me out here. I'm thinking in terms
15 of--
16 A.  I fell down after I hit the tree. I went
17 back. And I lay there, and I said: I'm out of work.
18 Sorry. My wife -- I didn't mean to say it like that.
19 Q.  What about your condition at the time made
20 you think, "I'm out of work"?
21 A.  I couldn't move. I couldn't breathe. And
22 I was in excruciating pain.
23 Q.  What happened next?
24 A.  My friend Bruce came down. I told him I
25 was very badly hurt. I knew I was badly hurt. I was

Page 16

1  in a very uncomfortable and awkward and painful
2  condition. Ski patrol was on the scene within a
3  minute, I think. It was very quick. They had --
4  they put oxygen on me because I couldn't breathe.
5  Q.  You did, in fact, puncture a lung?
6  A.  I crushed a lung. I broke 15 bones.
7  Q.  I'm sorry. I didn't mean to interrupt you.
8  You were telling me what happened. They put oxygen
9  on you --
10 A.  They put oxygen on me, and they made me
11 stay right where I was. They couldn't move me.
12 Q.  So, what happened?
13 A.  They had to put a piece of plywood
14 underneath me. And then they had to undo all my
15 clothes. They sliced my clothes off me. And I was
16 scared. I was very scared. I had never been hurt
17 before, that I knew of.
18 Q.  And never had any broken bones growing up?
19 A.  Actually, no. My nose is crooked, but that
20 was from getting hit with a baseball when I was a
21 kid. But I don't think that's a bone anyway. That's
22 a piece of cartilage. But that was it. I never
23 broke a bone before that in my entire life.
24     They put me on a piece of plywood.
25 And they undid my legs, which were just -- the

Page 17

1  position I was in was excruciating, but they couldn't
2  move me because they thought that my spine might have
3  been broken. And they had to stabilize me.
4     They put me in a sled. So, I got my
5  sled ride down the mountain, which was -- I was very
6  close to the bottom. We were on our way to lunch.
7     And they brought me into the ski
8  patrol shed down there.
9     This is a very rustic ski area. It's
10 not like Aspen. This is as rural and rustic, and --
11 that's why I like it so much. It was like real
12 skiing.
13     And then they did the, you know,
14 what's this? What's this? Do you feel this? Can
15 you wiggle your toes? All that.
16     They tried to call the Life Flight in.
17 But they couldn't, because it was snowing too hard.
18 They drove me by ambulance to Montpelier, to their
19 hospital. And then they gave me a choice of
20 St. Johnsbury or Burlington.
21     And I figured the airport at
22 Burlington would be closer for my wife, so I said
23 Burlington.
24     And then I had a -- they didn't give
25 me any pain meds at the ski area. And they didn't

Karen K. Harris, CSR, RPR, B.A., M.A.
Nell McCallum & Assoc.   (713) 861-0203

Page 18

1  give me any pain meds for the first several hours in
2  Montpelier. They had put a chest tube in.
3      Q.  Did they explain why they were not able to
4  give you pain meds?
5      A.  I don't think so. I don't really remember
6  that at that point. I was sort of -- my -- I left a
7  message for my wife on the machine, saying that I'd
8  been hurt. And my friend Bruce stayed with me.
9          Then he had to take the rental car
10 from there to there. He followed the ambulance to
11 the trauma center.
12         And then, from then on, everything was
13 a blur. You know -- they dumped, you know, whatever
14 narcotics. I mean, they couldn't level me out.
15 Catheterized me. And then I was pretty good for that
16 amount of time.
17         They put me in a hospital room. And
18 the rest of it, if you need it, I'll tell you. Do
19 you want the rest of the story?
20     Q.  When did you first learn -- let's back up.
21 You said you broke 15 bones.
22     A.  I didn't know I had broken any bones,
23 except that I was in excruciating pain. And on the
24 ride to the hospital, I went over as many -- you
25 don't know what a frost heath is, but it's a bump in

Page 19

1  the road. And there were probably 20 a mile. I was
2  on a board, smashing down on the bottom of the
3  ambulance. I was holding onto the guy, the ambulance
4  guy's hand. And he made the driver slow down because
5  it wasn't going good for me.
6      Q.  When do you remember being aware of -- when
7  do you remember being informed that you had broken
8  bones?
9      A.  After they cat scanned me.
10     Q.  When would that have been?
11     A.  In Montpelier.
12     Q.  And approximately how many hours or days
13 following this accident?
14     A.  Just hours. Three, maybe four hours.
15     Q.  And what do you remember them telling you
16 at that time?
17     A.  I don't really recall. I just remember
18 that I know that they kept taking me back in for more
19 x-rays and more cats.
20     Q.  Do you remember what seemed to be the area
21 that was causing -- area of your body that was
22 causing you the most pain or discomfort at that time?
23 If you can isolate it that way.
24     A.  No, I really can't. I was just -- in
25 general, I was just hurting.

Page 20

1      Q.  In hindsight, we can look at the medical
2  records and know what all the diagnoses were, in
3  terms of broken bones and collapsed lung, and
4  crunched ribs, and so forth and so on.
5          What is your understanding of the
6  bones that were broken, or the severity of the
7  injuries?
8      A.  At what point?
9      Q.  From your collision into a tree.
10     A.  I just knew I couldn't move. All I knew is
11 there had to be something more seriously wrong than
12 had ever been wrong with me before.
13         MR. RUBENSTEIN: I think he's
14 misunderstanding --
15         THE WITNESS: Did I get it right?
16     Q.  (BY MS. LIVINGSTON) You're doing fine. As
17 you sit here today, what's your understanding of the
18 nature of your injuries from your ski accident? If
19 you have one.
20     A.  Maybe you could be more clear on that.
21     Q.  Sure. From March of 2003 to the present
22 time -- which I think is September 21st, 2006 -- some
23 time has passed, and you filed the lawsuit.
24         I'm trying to get your present day
25 understanding of the extent and the significance of

Page 21

1  your injuries in March of 2003.
2          And if you don't have an
3  understanding, you can tell me you don't. But if you
4  do, I need to know what you currently understand
5  about the nature and the extent of the injuries that
6  you sustained as a result of your ski accident.
7          MR. RUBENSTEIN: Objection. Form.
8  You can answer as best you can.
9          THE WITNESS: I'm just -- from the
10 injuries, how am I affected? Is that what you want
11 to know?
12     Q.  (BY MS. LIVINGSTON) No. If you were
13 telling someone what happened --
14     A.  I just tell them I broke bones. I'm not an
15 expert, so I don't know if there was anything --
16     Q.  And I understand you are not an expert. Do
17 you ever -- when people do, when they ask you, have
18 you ever -- and you say: Oh, I've got a ski accident
19 story. I broke -- do you ever give a listing of
20 bones that you broke?
21     A.  No. I just tell them that I broke bones.
22 I broke 15 bones.
23     Q.  How did you come to understand the number
24 was 15?
25     A.  The doctor showed me all the different

6 (Pages 18 to 21)

### Page 22

1  things that were going to get -- you know, he pointed
2  it out to me.
3    Q.  Which doctor was that?
4    A.  Tim Sitter.
5    Q.  That's your doctor here, in Sugar Land?
6    A.  Right.
7    Q.  Do you have a recollection of having
8  discussions with the doctors in Vermont?
9    A.  No. Well, no. They were trauma doctors.
10  They came in, they looked, and they walked out. They
11  didn't say anything. They wanted me to get stable,
12  is what they wanted. Do you understand what I'm
13  saying?
14    Q.  Let me ask the questions.
15    A.  They didn't discuss my broken bones. What
16  they wanted to do is make sure that I wasn't going to
17  rip my -- puncture a lung again. They wanted to
18  stabilize me. And then I would get after-care. This
19  was a trauma center. They just wanted to have me, so
20  that I could move on to recover at that point.
21       MR. RUBENSTEIN: Just try and answer
22  her question.
23    Q.  (BY MS. LIVINGSTON): Did you have a
24  discussion with them about your condition?
25    A.  No.

### Page 23

1    Q.  Do you recall any of that?
2    A.  No.
3    Q.  Are you really telling me that the doctors
4  did not talk to you at all when you were there?
5    A.  My discussions with them, I don't remember.
6  I was under pretty heavy drugs.
7    Q.  And that's a difference between: We didn't
8  have discussions, and I don't recall the
9  discussions --
10    A.  I just don't remember. If we did, I don't
11  remember it.
12    Q.  Do your best right now, September 21st,
13  2006, to tell me what you understand about which
14  bones were broken or injured in your March 2003
15  accident.
16    A.  I broke every rib on my right side, except
17  for one. I broke 6 transverse vertebrae -- or 7
18  transverse vertebrae. I can't remember the exact
19  number. I broke my collar bone. I broke my finger.
20  And I broke a rib on my right side. I think that's
21  15.
22    Q.  Okay. A rib on the right side or the left
23  side?
24    A.  All the ones on my left side, except for
25  one were broken, and one on my right side.

### Page 24

1    Q.  Which collar bone was broken?
2    A.  My left.
3    Q.  Which finger was broken?
4    A.  My right pinky.
5    Q.  Where -- is your understanding -- do you
6  have an understanding of what transverse processes
7  are?
8    A.  I do not.
9    Q.  Where did you come up with that phrase?
10    A.  The doctor.
11    Q.  Would that be Dr. Sitter?
12    A.  Yeah.
13    Q.  Dr. Sitter wasn't the first doctor that you
14  saw in the Houston area; correct?
15    A.  He was what now?
16    Q.  Dr. Sitter was not the first doctor that
17  you saw in the Houston area about your injuries
18  following your skiing accident?
19    A.  No.
20    Q.  Who was the first doctor that you saw?
21    A.  I do not know his name.
22    Q.  How did you come to see that physician?
23    A.  The first one?
24    Q.  Yes.
25    A.  I believe he was on the PTO from the

### Page 25

1  insurance. So, he might have been on the list.
2    Q.  Well, would the fact that he was on the
3  list, would that have been why you chose him? Or was
4  there any other --
5    A.  That would have been it.
6    Q.  -- input into the decision?
7    A.  No.
8    Q.  Did you have any conversations with your
9  wife, or --
10    A.  My wife was the one who picked him, because
11  he was on the list. She handles the insurance.
12    Q.  Did your wife tell you any justification or
13  reason for the selection?
14    A.  I think he was the first one on the list,
15  and he was in Sugar Land.
16    Q.  Tell me about that visit to the doctor. I
17  realize you don't remember his name. But when was
18  that visit, and what did he tell you?
19    A.  It was in, probably, March. And he told me
20  that he wasn't going to do anything.
21    Q.  What were your complaints at the time?
22    A.  My bone was poking through at my shoulder,
23  and it would have gone through, had I not done
24  anything to stabilize it.
25    Q.  Can you be any more specific?

7 (Pages 22 to 25)

Page 26

1   A.   My bone was poking through at my
2   shoulder --
3   Q.   And which bone was that?
4   A.   My collar bone.
5   Q.   Okay.
6   A.   And it would have gone through the skin.
7   It would have come through the skin if I had not done
8   something about it. It wasn't going to heal by
9   itself.
10  Q.   And how had you come to that conclusion?
11  A.   I could see the bone through the skin.
12  Q.   What rationale did the doctor give you for
13  saying he would not do anything at the time?
14  A.   I'm not sure exactly what his rationale
15  was.
16  Q.   Do you remember any discussions when you
17  were in Vermont about treatment for your clavicle?
18  A.   No.
19  Q.   Do you remember checking out all the x-rays
20  from the Fletcher Allen Hospital, in Vermont?
21  A.   Yes, I do.
22  Q.   And you did sign for those, did you not?
23  A.   Either I or my wife did.
24  Q.   What happened to those?
25  A.   They are at my house.

Page 27

1   Q.   Okay.
2        MS. LIVINGSTON: We've made requests
3   for all the x-rays in this case.
4        I'm going to request again that we get
5   whatever x-rays he has at his house.
6        MR. RUBENSTEIN: Presurgical x-rays,
7   before the plate was put in?
8        MS. LIVINGSTON: Uh-huh.
9        MR. RUBENSTEIN: Okay. I thought
10  I had given you everything I had. I didn't know
11  about this until today, that there were still some
12  there.
13       MS. LIVINGSTON: Right.
14       MR. RUBENSTEIN: But I'll get those to
15  you.
16       MS. LIVINGSTON: I need those. I think
17  we had also said they would be subject to our
18  previous request. But there was also a subpoena
19  duces tecum.
20       So, if you can just get them, and
21  we'll arrange for them to be copied.
22       MR. RUBENSTEIN: I will. I apologize.
23  I wasn't intentionally trying to hide the ball or
24  anything.
25       MS. LIVINGSTON: I appreciate that and

Page 28

1   understand that.
2        THE WITNESS: If I had known, I would
3   have brought them today. Didn't know.
4        I also thought you could get them from
5   Fletcher Allen, too, as well.
6   Q.   (BY MS. LIVINGSTON): I will tell you that
7   Fletcher Allen has signed a letter saying that they
8   gave you the originals, and that you checked them
9   out --
10  A.   Yeah. I have them.
11  Q.   -- and that they have none left, to give
12  us.
13  A.   I did -- I did not send them back, because
14  I thought just this case might come up.
15  Q.   Help me out on the timing there. You did
16  not send --
17  A.   I did not send them back because I did not
18  know whether they would be needed or not.
19  Q.   When did you decide to sue Synthes in
20  connection with this case, or when did you decide to
21  bring this case?
22       MR. RUBENSTEIN: Object to the extent
23  that it gets into any kind of attorney/client
24  privilege.
25       MS. LIVINGSTON: Timing's not. My

Page 29

1   question goes to timing.
2        MR. RUBENSTEIN: I think it covers the
3   whole relationship. And timing has to do with
4   meeting with an attorney and coming to that
5   conclusion.
6        I'm going to advise you not to answer
7   that.
8        THE WITNESS: Okay.
9   Q.   (BY MS. LIVINGSTON): So we're clear, my
10  question is: When did you, Mr. Kaye, decide to bring
11  this lawsuit?
12       MR. RUBENSTEIN: Are you asking for a
13  date kind of thing, or what led up to it?
14       MS. LIVINGSTON: No. I'm asking for a
15  date.
16  Q.   (BY MS. LIVINGSTON) "When" means "when."
17  A point in time. When did you decide to bring this
18  lawsuit?
19  A.   I don't remember the exact date.
20  Q.   Give me an approximation, please, sir.
21  A.   It would have been after the surgery for
22  the faulty plate.
23  Q.   Which surgery would that be?
24  A.   That would have been the third.
25  Q.   Hadn't you, in fact, decided to engage an

8 (Pages 26 to 29)

Oral Deposition - Douglas Kaye
September 21, 2006

Page 30

1  attorney prior to surgery for the removal of the
2  broken plate?
3       MR. RUBENSTEIN: Objection. Asks
4  about attorney/client privilege. Please do not
5  answer that.
6       I'm instructing him not to answer
7  that, as phrased.
8   Q.  (BY MS. LIVINGSTON) Have you employed an
9  attorney prior to the surgery -- the explantation
10 surgery for the broken Synthes plate?
11      MR. RUBENSTEIN: Objection. Asks for
12 attorney/client privilege as phrased.
13      Please do not answer that question.
14 I'm instructing you not to.
15  Q.  (BY MS. LIVINGSTON) Had you told anyone at
16 the hospital that you had a lawyer on the morning for
17 the explantation surgery for the broken Synthes
18 plate?
19  A.  Yes.
20  Q.  Who did you tell?
21  A.  Kevin Attley.
22  Q.  Who is Kevin Attley?
23      MR. RUBENSTEIN: I don't know what to
24 do here. Go ahead and answer the question, I guess.
25      THE WITNESS: He's an attorney.

Page 31

1   Q.  (BY MS. LIVINGSTON) Did he accompany you
2  to the hospital?
3   A.  He was not allowed to.
4   Q.  Did he make requests to accompany you in
5  the surgical suite?
6   A.  Yes.
7   Q.  And, in fact, he wanted to videotape the
8  surgery, did he not?
9   A.  I don't know what his intentions were.
10  Q.  Do you remember seeing him with a videotape
11 camera?
12  A.  Ma'am, I do not.
13  Q.  Were you present when he was told that he
14 could not go into the surgical suite?
15  A.  No, ma'am, I was not.
16  Q.  Tell me how you sharpen the scissors.
17  A.  It's different with different kinds.
18  Q.  Okay.
19  A.  The basic procedure is to remove damage.
20  Q.  And damage being an uneven edge of the
21 blade?
22  A.  It's -- that's a broad category. But that
23 could be part of it.
24  Q.  Great. Why don't you describe it as
25 broadly or as narrowly as you can.

Page 32

1   A.  Scissors are an instrument. They are a
2  tool. And the tool has to be in good working order,
3  to function properly.
4       The damage that customers, either
5  through customer abuse or customer error, puts chips
6  or, you know, imperfections, that have to be removed.
7       Sharpening is a removal process. So,
8  we find a new layer of steel that has no damage in
9  it, resurface it, clean, adjust, and replace any
10 missing parts or pieces.
11      That's about it. It's honed and
12 polished.
13  Q.  Do you -- when I look at scissors -- and
14 they're not expensive Japanese hair cutting
15 scissors -- but when I look at scissors, there's
16 usually some kind of screw or manner of holding the
17 two blades of the scissors together.
18  A.  Uh-huh.
19  Q.  Do you generally remove the blades from
20 each other, to engage in the sharpening process?
21  A.  That's done on some.
22  Q.  I don't know how else to ask it that way.
23  A.  Right.
24  Q.  But you understand what I'm asking --
25  A.  Some scissors, it's done that way.

Page 33

1   Q.  What determines whether or not you separate
2  the halves of the scissors? Is that the model of the
3  scissors?
4   A.  Right. The quality of the actual
5  instrument.
6   Q.  Are the -- can you give me a rundown on
7  whether the more expensive scissors can be more
8  easily separated --
9   A.  The more expensive the scissors, the more
10 sophisticated all the pieces and technology is in the
11 tool. And it's a lot easier to take those apart.
12 High quality is always better.
13  Q.  Now, you said that the imperfections that
14 have to be removed, you said that they happen through
15 either customer abuse or customer error.
16  A.  Neglect.
17  Q.  On the part of the user of the scissors?
18  A.  Yeah. Uh-huh.
19  Q.  Is there any other mechanism or modality
20 for imperfections to occur?
21  A.  Manufacturer defects.
22  Q.  What about normal wear and tear?
23  A.  Normal wear and tear.
24  Q.  In other words, you understand -- and you
25 sell these scissors, as well?

Karen K. Harris, CSR, RPR, B.A., M.A.
Nell McCallum & Assoc.   (713) 861-0203

Page 34

1  A.  Uh-huh.
2  Q.  Is that a "yes"?
3  A.  Yes.
4  Q.  And you understand, when you sell the
5  scissors, they are being sold for cutting hair?
6  A.  Yeah.
7  Q.  We're not talking about just human hair,
8  are we?
9  A.  I have one customer that cuts dog hair, and
10 that would be our dogs.
11 Q.  What kind of dogs do you have?
12 A.  Bichon.
13 Q.  How many do you have?
14 A.  Two.
15 Q.  Did you have those in March through
16 September of 2003?
17 A.  We had -- yes.
18 Q.  What are your dogs' names?
19 A.  Keiki and Ditto.
20 Q.  Ditto, as in "again"?
21 A.  Yes.
22 Q.  What do you consider to be customer abuse
23 in connection with the scissors that you sell?
24 A.  It can range.  I've had one client use her
25 scissors for a screw driver, and she snapped the

Page 35

1  scissors in half.
2         Had another -- one of her customers,
3  different hair dresser, used her tools to cut her
4  credit card in half.
5         Had another customer's child use the
6  scissors to cut an electric cord in half.  That's
7  abuse.
8  Q.  What makes that abuse?
9  A.  It -- welded the scissors together.  Took
10 the electricity, and arced copper onto the steel.
11 And the scissors were like that permanently
12 (indicating).  That's abuse.
13 Q.  Is cutting the credit card, in your
14 opinion, abuse?
15 A.  Excessive.
16 Q.  Excessive abuse.
17        What kinds of instructions do you give
18 to your customers when you sell them the scissors?
19 A.  I have several that I have come up with
20 over the years by having a group of instructions that
21 I usually tell the people.  And if they pay
22 attention, they do well with them.  Taking good care
23 of your scissors includes oiling them and adjusting
24 them.
25 Q.  Do you want your customers doing their own

Page 36

1  adjustments to it?
2  A.  Oh, yes.  They're required to.
3  Q.  And when you say, "they're required to,"
4  what do you mean?  Who is making that requirement?
5  A.  Well, if the scissor is going to function
6  properly, it has to be adjusted periodically.
7         And that's going to be done by them,
8  because I'm not there every day.
9         That's something that they have to do.
10 They're required by the manufacturers in their little
11 instruction thing to oil their scissors daily.  They
12 usually don't understand that.  But daily is a good
13 thing.  So, they need to oil them.
14        They're supposed to be kept in a
15 protective case.
16 Q.  Okay.
17 A.  They're not supposed to drop their tools.
18 They're not supposed to cut things that are not good,
19 clean, wet hair.
20        They're supposed to find one sharpener
21 that they like, and stick with him.
22 Q.  Do you anticipate that your customers will
23 sharpen their own scissors?
24 A.  Never.
25 Q.  Would you consider that to be abuse?

Page 37

1  A.  I guess.  I guess that's vague.
2  Q.  When you say, "find one sharpener and stick
3  to it," do you mean an individual such as yourself?
4  A.  Well, there's many out there to choose
5  from.  But one person that would do the work.  The
6  reason is that everyone has a different idea of what
7  sharp is.  And it wears your scissor out to go from
8  one sharpener to the next.
9         They do one thing.  Someone else does
10 something else, and everyone takes off metal.
11        And every time you have your scissors
12 sharpened, serviced, whatever, you're wearing the
13 scissors away.
14        One person with one idea of what
15 they're doing is better than going to five different
16 people.  It's like your hair.
17 Q.  Do you ever sharpen knives?
18 A.  Never.
19 Q.  Have you ever done that before?
20 A.  Years ago.  Not professionally.  Just
21 myself.  It's different.
22 Q.  Tell me about the differences.  How -- when
23 you were sharpening knives, how did you sharpen
24 those?  Did you use a grindstone?
25 A.  Hand.

10 (Pages 34 to 37)

Karen K. Harris, CSR, RPR, B.A., M.A.
Nell McCallum & Assoc.   (713) 861-0203

Oral Deposition - Douglas Kaye
September 21, 2006

Page 38

1   Q.  A whetstone?
2   A.  Yeah.
3   Q.  Did you switch the blade, and go on each
4   side, or can you describe to me how you did that?
5   A.  There's different techniques.
6   Q.  How did you do it?
7   A.  Sort of one side and then the other.
8   Played around with it.
9       Like I said, nothing professional.
10  Q.  Now, describe for me the manner in which
11  you will use the sharpener that your brother
12  manufactured for you in your job.
13  A.  Say that again.
14  Q.  Sure. Give me a description of the manner
15  that you go about sharpening scissors using the
16  machine that your brother manufactured for you.
17  A.  Okay. It's a -- it's a procedure that I've
18  come up with over the years that I have been doing
19  this. It's an evaluation.
20  Q.  Uh-huh. What else?
21  A.  Determining -- the evaluation is to
22  determine the damage. And then, am I capable of
23  repairing this? If it's not something that has to go
24  back to the manufacturer.
25  Q.  Let me interrupt you there, if that's

Page 39

1   okay --
2   A.  Uh-huh.
3   Q.  -- and ask you: What determines whether or
4   not you feel capable to repair the damage?
5   A.  Certain blades have a set ability, meaning
6   that you can vary the angles that the blades
7   attach -- attack one another.
8   Q.  Okay. Say that word for me again. A set
9   ability.
10  A.  Set ability. It's a setting. A curve in
11  the blade is called a set. And certain scissors are
12  settable. Certain scissors are not settable.
13  Certain scissors are settable, but by the
14  manufacturer only. If they break them, that's their
15  business.
16      I look at it. If I say, through my
17  experience, if I do this, and it breaks, I'd own it,
18  and I don't want to.
19      So, I'd say: No, that has to go back
20  to the company. So, that's my evaluation.
21      The procedure for sharpening then is
22  to remove damage on each blade, and then hone them,
23  and then put them back together.
24      We are not going to get any more than
25  that. Basically, I put them back together.

Page 40

1   Q.  Okay. I'm particularly interested in the
2   removing damage and the honing part.
3       I assume that's where you use the
4   machine that your brother --
5   A.  Right.
6   Q.  -- has manufactured for you.
7       First, let's have you describe the
8   machine. How big is it?
9   A.  It's a --
10  Q.  Where are the moving parts?
11  A.  It's a unit that is about 22 inches long,
12  or -- no, 18 inches long, 9 inches high, and about 11
13  inches deep. It weighs about 24 pounds.
14      It is a horizontal hone. It is
15  fixtured. It has an articulating arm that is
16  adjustable. It has five moving horizontal discs,
17  plates.
18  Q.  Which are made of what material?
19  A.  Everything is billet aluminum.
20  Q.  The entire machine is out of aluminum?
21  A.  Except for the motor and the clamping head.
22  Everything else is -- and the hardware. I guess
23  there are some screws that are stainless steel. But
24  the majority of the machine is aluminum.
25  Q.  Including the blades?

Page 41

1   A.  Including the what?
2   Q.  Including the blades?
3   A.  Oh, no. The scissors? That's something
4   different. The machine?
5   Q.  Right.
6   A.  It's aluminum.
7   Q.  Aren't blades on the machine --
8   A.  No. There are no blades. Plates.
9   Q.  Plates?
10  A.  Did I say the word wrong? Plates,
11  P-L-A-T-E-S.
12  Q.  And what are the plates made out of?
13  A.  Aluminum.
14  Q.  Okay. Is it textured in some particular
15  way?
16  A.  No. It's annodized. The aluminum has been
17  anodized, if that means anything.
18      The actual abrasives are referred to
19  as lapping -- L-A-P-P-I-N-G. Lapping sheets. It's a
20  very thin Mylar material, with abrasive attached.
21  And I think that's aluminum oxide.
22      The hones -- which all of these are --
23  but then there are more hones are made out of felt.
24  And you apply diamond powder to it or diamond slurry,
25  I guess. I don't know what it's called. It's a

Karen K. Harris, CSR, RPR, B.A., M.A.
Nell McCallum & Assoc.   (713) 861-0203

Oral Deposition - Douglas Kaye
September 21, 2006

Page 42

1  paste.
2        Do you want me to keep going?
3   Q.  Who is your supplier for the diamond
4  powder?
5   A.  I get this from my brother.
6   Q.  So, your brother supplies all of the
7  equipment that you need?
8   A.  For me, he does. Yeah.
9   Q.  What's your education background?
10  A.  I went to high school. And I went to a
11 year of business college. And then I went to a year
12 of college for graphic arts, printing.
13       MR. RUBENSTEIN: If you get to a place
14 to take a short bathroom break --
15       MS. LIVINGSTON: Sure. If you want to
16 take a break now, that's fine.
17       MR. RUBENSTEIN: Thanks.
18       (Recess taken)
19  Q.  (BY MS. LIVINGSTON) You were telling me
20 before our break -- you were telling me about you had
21 spent a year in graphic design in college, studying
22 graphic design?
23  A.  Right.
24  Q.  Now, did you do that -- I'm trying to get a
25 sense for the chronological progression of that. Did

Page 43

1  that happen in the -- if there is such a thing -- as
2  a normal time for higher education, did that follow
3  shortly after your high school completion?
4   A.  I went to college in New Hampshire for
5  business the following year. I graduated in '70, so
6  I was in college in '71, in New Hampshire.
7        And then I worked for three years,
8  and then I sent myself back to college for art,
9  graphics.
10  Q.  In the three years that you worked, between
11 business school and going back and studying graphic
12 arts, what kinds of work did you do?
13  A.  I was a pressman.
14  Q.  Printing?
15  A.  Yeah. At a newspaper.
16  Q.  Did that involve physical manipulation of
17 the machines?
18  A.  Yeah. Running the thing.
19  Q.  Making sure the paper was flowing?
20  A.  Right. Sacking up the trash, and sweeping
21 the floors. We did it all. You start out as an
22 apprentice, and work your way through.
23  Q.  I bet that job that you did has long since
24 been replaced by automated print machines. Do you
25 know?

Page 44

1   A.  I think that the newspaper industry has
2  gone through dramatic changes in the years since I
3  was there.
4        Back in those days, they were just
5  getting into the photo printing, offsetting. And
6  when we were doing it, we were doing, like the lead
7  type stuff, with the machines and all that.
8        It's just -- I don't know. I'm not in
9  it anymore. It's been years since I was. But I
10 think things have changed dramatically. A lot of
11 things have. I'm sure that has, too.
12  Q.  Did you -- through your one year of graphic
13 arts, were you able to complete a course of study
14 during that time?
15  A.  No. I didn't. I wasn't financially able
16 to afford to pay for everything myself. I went to
17 school for the amount of money that I had, and that
18 was that.
19  Q.  What did that allow you to accomplish,
20 following that?
21  A.  What did I use that for?
22  Q.  Yes.
23  A.  I paid back my loan in printing. And then
24 I decided that to work for yourself is better than to
25 work for someone else.

Page 45

1        And I never thought I would own a
2  printing plant, so I decided I was going to work for
3  myself.
4   Q.  And that's what led you to go into graphic
5  arts?
6   A.  No. No. That got me out of graphic arts.
7   Q.  What did you start doing following your
8  year of study in graphic arts?
9   A.  I worked assembling and manufacturing
10 specialty electronics.
11  Q.  What kinds of electronics?
12  A.  Battery packs and circuitry for NASA, Woods
13 Hole Oceanographic.
14  Q.  Was that your employer, Woods Hole?
15  A.  No, no. We were a separate company. It
16 was called Burlington Battery. It no longer exists.
17  Q.  Did you have any kind of ownership interest
18 in Burlington --
19  A.  Actually, I did. I was an employee/owner.
20  Q.  Were there other owners?
21  A.  My dad.
22  Q.  How long did you work with Burlington
23 batteries, approximately?
24  A.  Seven years.
25  Q.  What did you do next?

12 (Pages 42 to 45)

Karen K. Harris, CSR, RPR, B.A., M.A.
Nell McCallum & Assoc.   (713) 861-0203